Our next case is 2018-1439, Technology Properties Limited v. Huawei Technologies Co., Ltd. Good morning, Your Honors. May it please the Court. Appellants assert that what happened on remand here demonstrates the clear error that occurred when the Court's prior decision in this case was used to find that the very structure disclosed in the specification of the patent was deemed to be non-infringing on summary judgment. Accordingly, this case presents a unique situation where appellants asked this panel to revisit the Court's prior claim construction to find that any disclaimer that occurred occurred when the claims were amended. With regard to the Sheetz reference, the entire oscillator was limited by amendment to overcome the Sheetz reference as reflected at APPX 2126. With regard to the Magar reference, the claim was amended to add additional elements to overcome the Magar reference, and that can be seen by comparing the issued claim with Claim 73 at APPX 2126. Are we debating what the claim construction is right now? Yeah. Okay. The claim construction that we already issued a couple of years ago? Correct. Okay. Don't you need to get over some hurdles first before we revisit whether or not we should even be entertaining this kind of argument? I agree that we do have to get over some hurdles. We do have to show that there is clear error in order for the Court to revisit under the law the case doctrine. There has to be some kind of manifest injustice for you to trounce the law of the case. Correct. And we believe that a manifest injustice is that what happened here on summary judgment is that the actual embodiment of the patent was found to be non-infringing. So that those disclaimers that were imposed read out the entire embodiment that is disclosed in the specification, and that on its face is manifest injustice and clear error. And that is Appellant's position on clear error and manifest injustice. Even if you're correct about what you just said, isn't it possible during prosecution history that in light of prior art that's brought to light by the Patent Office that someone, a patentee, could amend or limit their claims in ways to exclude embodiments that are otherwise disclosed in the spec? Isn't that something that can and does happen regularly? It can happen, but it didn't happen here. So I think that's the issue. With regard to the sheets reference, the patentee faced a single clock reference that was a VCO that was off-chip and a CPU on a separate chip. And that was amended, the way that that reference was overcome was by amendment when the patentee added to the claim specific language to overcome that reference. And in particular, the patentee added that it was on a single integrated circuit constructed of electronic devices and that the fabrication or operational parameters associated with the integrated circuit substrate. So specific amendments were made to overcome that particular limitation. So certainly statements can be made that are broader, although we advocate in our brief certainly to preserve the issue that in fact prosecution history shouldn't be that broad in accord with Supreme Court precedent. I understand that this panel is bound by the precedent of this court, but we do wish to preserve that issue. And we think this case is an exemplary case where you have a situation where statements were made, the statements were not relied on by the examiner. What was relied on was the amendments. And you had a single clock embodiment. The patentee initially pursued the single clock embodiment. The examiner said, we're not going to give you the single clock embodiment. They made some amendments to the claim. And then ultimately what the examiner said was, if you add these dependent limitations, which relate to another embodiment in the specification, then you can have the claim. So the entire oscillator limitation was issued as written when additional limitations were added to the claim. And so it is our position that the court should revisit those limitations. But even still, the prosecution history is instructive when we consider what happened in the summary judgment proceedings. And in that case, even if the disclaimers are applied in this case, then we believe that there are still disputed questions of fact that preclude summary judgment here. What we have in this case is the exact structure that is disclosed in the specification in the defendant's accused products. It is a ring oscillator comprised of an odd number of inversions, where the output of the ring oscillator is connected to the input of, sorry, the output is connected back to the input in a ring, and therefore oscillates inherently. That's from the court's prior order in this case. And the defendants have exactly that structure in their product. In addition to that, we have an apparatus claim. It's an apparatus claim that is a microprocessor system comprising a CPU, an entire oscillator on the same substrate, an on-chip I-O interface, and an off-chip external clock. The accused products have all of those features. What about the phase-lock loop, though? Your patent spec doesn't contemplate or disclose the idea of having a phase-lock loop that basically serves as a puppet master over the ring oscillator, basically designed to prevent the ring oscillator from doing what it would naturally do due to parameter variations. In fact, the ring oscillator is totally regulated by the phase-lock loop to maintain a stable frequency unless the PLL chooses to issue some kind of command input that then regulates the VCO to artificially accelerate or decelerate in terms of frequency. Exactly. So the PLL is there because the accused infringing structure is there. The ring oscillator will oscillate inherently. That's a feature of a ring oscillator. It can't, though, in the accused product, right? It does in the accused product, and that's why the PLL is there to compensate for it. But the VCO is not permitted to do what the VCO would do under normal circumstances. It's being entirely regulated by the PLL. Is that what you're saying? In the addition of structure, additional structure does not mean that the actual apparatus is not present in the accused device as claimed. Because the other aspect of the apparatus as claimed is that it doesn't actually require any variation in operational parameters. If you read the actual language of Claim 6 and the entire oscillator, and this was, I think it was in Appelli's opposition brief, they highlighted an aspect of the claim on page 5 of their brief, and they left off a really important portion of the claim, which says, thus varying the processing frequency of said first electronic devices and the clock rate of said second plurality of electronic devices in the same way as a function of a parameter variation in one or more fabrication or operational parameters. So this is an apparatus claim that requires only variation in one or more fabrication or operational parameters. So even if I accept that the PLL limits the operation of the claim, the claim itself only requires variation in one fabrication parameter. And when the entire oscillator is fabricated on the same substrate as the CPU, that claim limitation is met. And the entire oscillator is present in the accused devices as claimed in Claim 6 of the claim. Are you saying the district court overlooked this argument? The district court overlooked this argument. Did you make this argument to the district court? We made the argument that the entire oscillator meets the limits... Yes, strike that. That the... It's a more nuanced argument that you're making about the distinction between operational and fabrication parameters. It is a more nuanced argument that we made, but we did have the evidence in the record and make the argument that the inherent characteristics of the oscillator and the accused devices meet this entire oscillator limitation of Claim 6. And because it inherently has the characteristics and it is fabricated on the same semiconductor substrate as the CPU. So as it turns, as we turn to the evidence that was actually presented with regard to the summary judgment, assuming that the court does not revisit the disclaimers, as the court has already pointed out, the appellees focused on the PLL and not the VCO. And I want to say one more thing about the disclaimers before I move on to the summary judgment evidence. It's the appellees themselves that invited reopening of the claim construction in this case. They introduced into evidence in the context of the disclaimers. Now the words that are in the disclaimers themselves appear nowhere in the claims and appear nowhere in the specification. So when it came to summary judgment, appellees put into the record an expert declaration that gave claim construction of the term command input. They relied on dictionary definitions, they relied on expert testimony, and they relied on patents, one of which postdates the actual patent to come up with this claim construction of command input that allowed the district court to reach its decision. That claim construction of command input is essentially any input that influences the, that triggers the device to operate. So in the claim construction that was actually adopted by the district court, which is a set of disclaimers that we contend should not even be there, even the operating voltage of the entire oscillator would not, as it sits, as they claim that the patent exists, would not meet the limitation of sheets. One of your arguments in your briefs, and I know that you recognize that that would have to await in-bank action, is that a prosecution disclaimer should not be able to occur by virtue of an actual amendment to claims, is that accurate? It is accurate, except the one thing I would say is you could say in the prosecution, I disclaimed this, or you could make some unequivocal statement that I disclaimed. Well, we already say for something to be a disclaimer it has to be clear and unambiguous, so I think that actually equates to an unequivocal statement, unless I'm wrong. Yeah, so, I mean, I think it would be a statement, I suppose the only exceptions that might be I disclaim an oscillator. Oh, so you think that magic words should have to be employed in order for a statement to count as a disclaimer? No. It is our position that only an amendment is what is required, which should be a part of it. Okay, so just out of curiosity, do you know how many decades it's been where we've treated amendments, I mean arguments, as creating estoppels or disclaimer in addition to amendments? I do. How many? I believe it has been, well, I know that the first case I believe was in the 90s, and then I think the place where it really went towards So like 20 to 30 years, right? Correct. Okay, so what's the patent term? I'm sorry? What's the current patent term? 20 years. 20 years. So, do you have any sense of how many issued patents exist? Many. Many. Yes. Millions and millions of issued patents. Correct. Every one of those patents would have been issued with the understanding that you could create disclaimers because it was the clear and unequivocal law. You can create disclaimers and thereby modify your claim scope through argument as well as amendment. Today, one of the arguments you've brought to us and you intend to bring to our in-bank court is that we should disrupt those extraordinarily settled expectations, and that every one of the many millions of patents that were issued with the understanding that arguments made could create a limitation on the scope of those claims would now be uncertain as to what their scope is because those were arguments, not amendments, and all competitors who would have made business decisions based on those arguments would now be, I don't know, I probably shouldn't say the word screwed, but really in a bad way. I respectfully submit that I have never seen a case, and I've read all of these opinions on prosecution history, where there's ever been any evidence that a competitor has actually relied on it until an allegation of infringement has occurred. But wait a minute. But that's just it, right? If you make a clear statement of disclaimer in your prosecution history, then every competitor can rely on it, and those cases don't get brought. The only cases that get brought, I mean, this is called the Priestkind Selection Effect Theory, so I'll tell you a little bit about economics. The only cases that get brought are the close ones, the ones where there's a potential dispute over what the statement means or doesn't mean, or on the flip end of it, sometimes they get brought if it's a bet-the-company kind of case. Either way, even if it's a dog of a case, it gets brought still. So for the most part, the cases that you actually see written opinions on are generally closer cases, because companies aren't dumb. They don't spend tons and tons of money litigating things that they can see clearly they're not going to prevail on. But you're asking us, I mean, I can't imagine stare decisis playing a bigger role than it does in what you're asking us to do, because you are truly asking us to upset the settled expectations of the entire industrial business community that relies on patents, because every single patent ever issued, which is still in existence, would be affected by the rule you're asking for. Your Honor, well, this patent was filed in the 80s, but the other issue- The rule of law you're asking us to change is a rule of law that all businesses have relied on to interpret all patents in existence. And if there had been evidence in any case where-I've never seen a case where a company actually said we relied on the prosecution history, even in the context of litigation, post-litigation, until after there's an accusation of infringement. But I agree that these are close cases, and that's another reason why here this disclaimer is all the more troublesome, because we've already been back and forth- Yes, but that was something you could have prevailed on the first time, but not under the manifest injustice standard. I understand. I understand. Close cases, which you just admitted this is, don't rise to the level of manifest injustice. Well, I think that the summary judgment record actually demonstrates that it does. When you get a summary judgment ruling, that actually precludes the actual structure that is in the claim and meets the limitations of the claim as written, which doesn't require any of the variation- I guess what I'm curious about is, why is it-do you think it's okay for a patent applicant to say one thing to a government agency about the scope and meaning of its claim, of its property interest, and then, say, a decade later, just say something completely else, and say, don't worry about what I told the government agency? I mean, I understand that, because the Supreme Court says that the claims define the meets and bounds and scope of a patent claim. That's right. And then we have to figure out what does those claim terms mean? And now we have the patent owner himself explaining what the scope and meaning of those claim terms are when he comes forward and expresses a specific conception of what those claim terms mean. Sure. And so then why would it be that we would bless a patent owner's choice to forego and in front of the agency during the patent application process? Well, I think there's two things here, which is- Why can you tell the examiner one thing and a district court judge another thing about the exact same claim term? That's what I don't understand. Sure. I don't actually think that's what's occurring here. I mean, what happened here was- Well, I'm trying to understand your theory for why it's wrong to have prosecution history disclaimer in understanding the construction of claim terms. Well, I think it's- So disclaimer is not understanding the construction of claim terms. You can look at the prosecution history for the meaning of claim terms. What happened here was a finding of disclaimer, which is that I gave up claim scope. And my position is that in the context of disclaimer, the claim scope was given up when the claim was amended, initially when the claim did not make clear that the entire oscillator and the CPU were on the same substrate. And so the claim was amended to tie those two things together and to make them vary with regard to operational or fabrication parameters. Those limitations were added to the claim to make that happen. So I don't think there are inconsistent statements that are made. But when we're talking about prosecution- So I believe that the prosecution history can be used to interpret the claims. And as long as in accordance with Markman, it doesn't vary, diminish, or otherwise change the scope, it is completely fair game. That is not my position. My position is when you're talking about surrendering claim scope, that the way to surrender claim scope is through amendment. And that is exactly what happened in this case. Okay. We will restore two minutes of time for rebuttal. Thank you. Let's hear from Mr. Fowler, please. Thank you, Your Honors. Please, the Court. With respect to the claim construction and disclaimer issue, I will note that although the Court has already addressed an argument today, stare decisis in law of the case. And so I won't repeat that. That's in our brief. But there's another hurdle that appellant needs to get over here. That's waiver. And in this case, this Court has already set the claim construction. Appellant cites in the reply brief the Harris case for the proposition that you can revisit claim construction in a second appeal. But that rule is awfully narrow. What Harris says is that if the same concept is being addressed in the second appeal, you can do this. The concept here is quite different. In Harris, there was a situation where there was a two-step construction that was being advocated. And the only difference between the first argument and the second argument was whether it happened in the structure or the function. And in that case, this Court found that the difference in argument was only slightly different or insubstantial. Here, there's not a same concept issue. In the first appeal, appellants took the view that this Court's four decades-long jurisprudence on disclaimer applied and then applied that to the facts of the case to argue that there was no disclaimer. Now, they're not taking issue with the facts. They're saying that your law is wrong and should be reversed. That's not the same concept. That's a very different concept. So there has been a waiver here since this argument was not raised before. With respect to the balance of the arguments, the core of what appellant says in the reply brief, and we heard it three times today during oral argument, is that the oscillator that's described in the patent in the VCOs and the accused products are the same. If you look at the reply brief, it winds its way through almost every argument they make and is the premise of every argument they make. And today, you heard that that was the premise of their clear error argument for the law of the case doctrine, and they also pin that as being the basis that even if the current claim construction survives, it's the premise of their non-infringement argument or their infringement argument. But the problem with that is that unrebutted evidence shows that their position is wrong. And just as a reminder, their argument is that the accused VCOs only have one voltage input. And they say, well, guess what? There's only one voltage input in the ring oscillator that's described in the patent, and both of those, they say, are the operating voltage, and so they're the same. So how could it be that they don't infringe? Well, that's just attorney argument because all of the evidence before this court is that the accused VCOs have two voltage inputs, an operating voltage and the control voltage. And the evidence of that comes from Dr. Subramanian's testimony in his declaration at paragraphs 47 through 51, that's at appendix 53, 28, and 31. And significantly, although Dr. Okloja, the expert for appellants, submitted a very long declaration, he didn't take issue with anything that Dr. Subramanian said on this point. Dr. Subramanian testified in detail at appendix 53, 29, paragraph 48, that all semiconductors by necessity have to have an operating voltage, including all of the accused VCOs here. And then he went on to say, and I'm quoting, and this is at the same location, the existence of the operating voltage input is so commonly understood that it is often not shown in logic circuit diagrams. Significantly, when appellant points to the ring oscillator that they say is identical to the accused VCOs, what do they point to? They point to figure 18 of the 336 patent. Guess what? Figure 18 of the 336 patent doesn't show a voltage input of any kind, including the operating voltage, which underscores Dr. Subramanian's undisputed testimony that such inputs are not shown. What is shown in both the representative diagram that the parties have used, the lawyer-written diagram that's in each of the three briefs in this case, it shows the voltage control. It's labeled the PLL control signal. That's the voltage control. And then they also point to the Qualcomm data sheet, and what's shown there is the control voltage again, because it's understood that there's an operating voltage. And you'll see that... On this side, it's showing us a circuit diagram where the VCO can be switched between the PLL and Brown. Thank you, Your Honor. I wanted to address that next, and I'll lead right into that by saying there's not one site, not one site by an expert, a fact witness, or anyone in the seven, roughly the five pages that they address of this difference of the one input versus the two. At pages 7 through 12 of the brief, that supports their arguments, entirely attorney argument, which turns exactly to your question. Because what they go with next on page 12 and 13 is another entirely new argument. And by the way, I think I failed to mention this, but the one input versus two input argument, that argument is waived. It wasn't made before the district court, either in the papers or oral argument, or even in their initial brief here. Same thing is true of the argument that you just raised, Your Honor, at page 12 and 13. They argue that in certain circumstances, the VCO of the accused products is not connected to the rest of the PLL. That argument was not made in the district court, either in the papers or oral argument, nor was it included in the initial brief here. It was waived. Nor, you will see, Your Honor, if you look at the two pages, 12 and 13, there is not a single evidentiary site to the record supporting that argument. Not one, not to an expert, not their expert, our expert, any expert. And so what we have here is they have attorney argument based on a figure, based upon the lack of evidence. Now, in candor, Your Honor, there is no evidence on this issue. What happened, as you may recall, this case first initiated in the ITC many years ago. This patent was asserted. Three sets of counsel ago for appellants made this argument in the ITC, and that argument was rejected because there is undisputed evidence that when you look at that particular configuration, not just the switches in the middle that they point to, but the switches on the far end, that that configuration is never, ever used to clock the CPU. And Claim 6 clearly requires that the oscillator be clocking the CPU at a clock rate. So in that configuration, there's no inference. So why is there a switch there between the VCO and the PLL? To put it into a different, it's in a different operating mode other than used for clocking the CPU. So the claim itself, Your Honor, requires that said, I'm quoting from Column 2, Claim 6, Lines 20 through 22. It said, said oscillator clocking said central processing unit with a clock rate. So what has to happen for this claim to be practiced is that there has to be a frequency leaving the oscillator and clocking the CPU. In the configuration that's shown at page 12 of the reply brief, there is no frequency at all of any kind. Not the fixed frequency that you see when the PLL is active and not this hypothetical change of frequency. Nothing's exiting the PLL to go to the CPU to clock it. Now there's no evidence in the record on that because this argument was not raised until the reply brief on this appeal. It wasn't argued below and it wasn't argued even in their opening brief. But I will represent to the court that this argument was made in the ITC. Evidence was presented of what I've just said and it doesn't happen. Now that should not lead to a remand because... Did you also make the argument below that the accused products are fixed by an external crystal as part of another basis for summary judgment? Yes, Your Honor. And the district court didn't reach that, right? Correct, Your Honor. But the picture of the accused product shows the court's crystal as the reference signal coming into the PLL control circuit. Correct. And so even if they were to prevail on summary judgment somehow in this particular appeal, the most they would get would be a vacant remand for the district court to then address the alternative arguments that you made which could also possibly entitle you to summary judgment. Well, Your Honor, we would say that this court could find that the alternative grounds exist. All of the evidence is before the court. And the undisputed evidence with respect... And it's been briefed by both parties too as to whether it applies. The MAGAR reference requires that the clock, the CPU, not be fixed by a fixed signal coming from the crystal clock. And here what we have, undisputed evidence, is that the reference signal that comes from the crystal is turned into, or the ultimate control signal that governs the oscillator is always, 100% of the time, a fixed multiple of the reference signal. And that multiple is determined by values that are set in the programmable divisors as part of the CPU... I'm sorry, that are part of the PLL. And so it is always the case that that fixed signal is being governed by the reference signal. And the flip side of it is the claim requires instead that the frequency that's output to the CPU be variable by PVT. And that never happens. So there are facts for this court, if it needed to, to uphold the judgment based upon the MAGAR disclaimer as well. Anything further that you think we need to hear? Your Honor, just very briefly, I do want to point out the command signal. Because there was some argument, I'm sorry, two things, just in rebuttal. There was an argument made that the fabrication parameter somehow is their savior to get out of here. But the fact of the matter is that there was no evidence in the court below that any of this alleged fabrication issues resulted in different frequencies that were output to the CPU. And in fact, Dr. Subramanian's testing would have shown any such variation, but there wasn't. And we saw Dr. Subramanian's testing variation showed that the variation issued from 0... I'm sorry, .0000087 to .00064. And that is as compared to .01, which is the variation that you see with the crystal at the time of the invention. So if there had been some kind of fabrication variation, which they had never pointed to any evidence of, it would have been picked up by Dr. Subramanian's testing, but we never saw that. So there's no evidence to overturn the summary judgment ruling on that basis. And the last thing I want to say is there was... I'm just curious, you're saying the output of the PLL is more stable and more precise than the output from a crystal? Yeah, well, that's a very good question. The issue of what fixed means, I think, is logically tied to what the variation of a crystal would permit at the time of the patent. Because the parties are talking about a fixed frequency. What is a fixed frequency? During prosecution, the applicant talked about the fact that a crystal would have variation even under PVT. That's at appendix 2093. It acknowledged that it would vary minimally even under PVT. So Dr. Subramanian said that at that time, the variation that would be deemed fixed is 0.01. Now, more modern crystals, you can see somewhat even less variation. They're better than the old crystals. And that's in the papers, too. I don't have the site for that right now, but Dr. Subramanian addressed that as well. And that's the difference. But from our perspective, what fixed means in the patent has to refer to what fixed meant to the parties at the time of the application. Now, with respect to the point that counsel made in terms of command input, counsel suggested that the district court had somehow adopted a definition of command input that's not in, you can't find it in the district court's order. The command input that's at issue here under sheets is the digital command that's sent to the registers of the digital divisors to change the values that allows one fixed frequency to change to the other. The district court found that that was the command input. The district court also found that there was a second command input, which is the control voltage. That's what counsel's focused on. But Dr. Subramanian, all he did there was point to the fact that there were two patents in the field of inquiry here that equated a command input with a control voltage. And he happened to point to the dictionaries as supporting that. But he never suggested that an operating voltage was a command input, nor did the district court. That's all I have, Your Honor, unless I have any more questions. Okay, thank you. Two minutes of rebuttal time. Ms. DeMore. Thank you. Briefly, I just wanted to point out with regard to this fabrication issue, Judge Chen asked a question about it, and it's just now been stated that there was no evidence in the record about that. But this evidence was presented to the district court, and it was rejected in its footnote 1 at APPX 0005. And the evidence was in our expert declaration at pages 6538 and 6543-44 of the appendix. So there is expert declaration testimony about the fabrication parameter, which alone is enough. Now, I heard this argument right now about you can't tell a variation of fabrication parameter because of this testing. A variation of fabrication parameter means that both the CPU and the oscillator are fabricated on the same wafer, and so they vary in the same fabrication parameter. There is evidence in the record of that that I just cited, and that is enough to reverse the district court's decision. In addition, I was- Is the output of the PLL slash VCO in the accused product varying in accordance to whatever the fabrication techniques were involved in creating the VCO? My understanding of the way this PLL slash VCO works is regardless of the origins of fabricating the VCO, regardless of the PVT variations the overall chip might undergo, the output of the PLL slash VCO is going to remain stable. Unless there's something in the control voltage that forces the VCO to output something faster or slower for a period of time. Yeah, if you read column 17 of the patent though, when it talks about the fabrication parameter, it talks about- I'm talking about the accused product right now, and it's PLL slash VCO output. Correct. I mean, I don't disagree with that. What I was going to say though is what the claim means in terms of fabrication parameter is that if the two devices are produced on the same chip, they have the same capabilities. So that if you don't have an oscillator like you did in the past that was separate from the chip, that goes faster than the CPU. So they both have the same capability. That's what the specification means when they talk about varying in fabrication parameter. So the fact that the accused products have the CPU and the oscillator built on the same chip, they do vary in the fabrication parameter. And there was evidence in the record that the court rejected at footnote one of its opinion. But we believe it's enough to sustain the judgment. Okay, counsel, you are well over the time and the extra time I gave you, in fact. So we're going to call it for today. Thank both counsel. The case is taken under submission.